May it please the Court, my name is Cassie Marks and I'm here along with Brad Lege on behalf of the appellant Brian Colbert. It's an honor and a privilege to be here and we appreciate the opportunity to present this oral argument in support of our briefing. And I've reserved five minutes of my time for rebuttal. This is a products liability personal injury case brought against Norcold, Thetford, and the Dyson-Kissner-Moran Corporation, to whom I will refer collectively as Norcold, by Mr. Colbert, who was at the time, and still is, but to a limited degree, a sheriff's deputy and a voluntary firefighter. The issue we come here to address today essentially boils down to this. Who compensates Mr. Colbert for his injuries as a first responder, a hero, for his on-the-job injuries caused by a product known to be defective by Norcold? Is it the taxpayers or is it the company that put the defective product on the market for decades, never addressed the root cause of the defect in seven recalls, regardless of how much money was spent on those recalls, essentially? Can I ask you a question that may not be relevant at all? Yes, sir. If you have an arson fire, a warehouse is burned down by arson, and the fireman comes to the fire and is hurt by a beam that falls on him while he's putting out the fire, does he have a cause of action against the arsonist? Under the intentional conduct exception, I would believe so. And what about causation? In other words... The beam would not have fallen but for the fire caused by the arsonist. But the fireman is there. He's not in the scope of... The people who live in the building and the property that's in the building is obviously the target, but the fireman comes there voluntarily to put out the fire, and that's the risk he assumes when he goes there. Every fire has risks. And... All right, I hear you. Going back to, or is it the company that put the defective product out there knowing it was defective, despite numerous recalls that were never intended to and never addressed the remedy here, then sent customers home with retrofitted products, telling them affirmatively that the products were safe, knowing that they were still corroding, knowing that they were still leaking highly flammable toxic gas, but never warning them of that. Should a first responder retain the right to redress his grievances against the tortfeasor, or should the manufacturer retain the equivalence of full indemnification by the taxpayers for a preventable injury caused by a product known to be defective, neither effectively addressed by any recall nor warned about? This is a situation where a company put profits over safety, and if this is not the textbook definition of what is willful or wanton or grossly negligent conduct, we don't know what would be. The first responder does not assume the risk of defective products. It does not assume the risks of willful and wanton, grossly negligent or intentional conduct. No, I don't think you should keep sticking in grossly negligent. That was added later, and the Supreme Court made the dichotomy between negligence and willful and wanton. Yes, sir. However, Hudgens v. Holman, the court actually talked about gross negligence and willful and wanton together, and we contend that the statute was amended to codify the gross negligence exception, which was already in common law, although really only used in that one case, and we contend that this was a clarification of that and that it should apply retroactively because it was merely a procedural or remedial change and did not materially affect a substantive right. If it doesn't mean anything, then, I mean, why are you using it? The question is the statute, the exception, didn't include it, and if it means something, it's important for you to have it, then it's a substantive change that wouldn't be retroactive. Well, Your Honor, important to have it in the sense that there is a distinction. Well, go ahead. You can make your argument. Okay. I was troubled by the gross negligence application because that was something recently added. Yes, sir. Okay. Let me ask you. Yes, sir. A question that may even be irrelevant. If I intentionally start a fire and the firemen are called to extinguish the fire, how does the fact that I intentionally started the fire affect the risk that they face when they come to fight it? I don't understand why, for example, liability is put on a potential defendant based on the degree of fault they had in starting the fire because it doesn't seem to affect the risk that the fireman's rule is based on that the fireman faces when he comes to fight. Right. I understand what you're saying. Really, I think the fireman's rule was initially codified from common law to protect against negligence, you know, negligently based risks, and initially was to protect premises owners from being sued. Of course, it's been extended out from there. But in a situation where you have an intentional actor or a willfully and wantonly, you know, actor, we're no longer in the realm of negligence. And what we have there is a situation where it could have been preventable. You know, and the risk here we're really looking at is who... Negligent. Negligent causing of a fire could have been preventable. It could have been, but that is a less culpable degree of conduct, and I think they're looking at the degree of conduct here. Willfully and wantonly is not the same as negligence. My question is how does that affect the risk that the fireman takes? When he gets there, the fire's already gone. How does that affect the risk? It may, like you say, it may be completely irrelevant. Well, I think... Virginia's already made these decisions. Yes, sir. I'm just curious as to what expectation you might have. The question here is not the risk assumed by the fireman. It's who pays for his injuries. He's asking a question about risk, and it's a question I have too. In other words, a fire started accidentally, negligently, or intentionally is still a fire. Yes, sir. And the nature of the fire is no different. He fights that fire based on the fire. So the question is how does the risk of fire change by the person, the reason the fire was started? The risk is the same. It's a fire. It's a building on fire, and the fireman comes there. The question is how is that risk changed by the way the fire was caused? I don't think we expect our first responders to go out there and... Answer that question. You know the answer. Well, the assumption of risk is not meant... The assumption of risk. How is the risk that the fireman faced changed? The character of the fire doesn't change, does it? No, sir. So the fireman's facing the same risk whether the fire was started intentionally, negligently, or accidentally. Yes. Okay. Yes, but the question is who compensates him for that? Well, no, that isn't the question. The question is when you're attaching liability, the question, it may come down not to the fireman's role. It may come down to the causation. There may be an intervening cause that regardless of the fireman's role, that the person who started the fire is not the cause of the fireman's risk. His risk is the same regardless of how the fire was started. His risk is the risk of fire, fighting a fire at a building, and he goes to the fire regardless of whether it was started intentionally, negligently, or not. So he's facing the fire, and a beam falls while he's fighting the fire, and hits his shoulder, breaks his shoulder. That risk is the same regardless of how the fire was started. The risk is created by the fire itself, and maybe there's an intervening causation involved, but the fireman's role is an interesting one, and probably started from the use of such a risk. Well, I'm not sure that begins or ends the problem in this case. No, sir, but we still come down to the cause of the fire. None of that would have happened but for the fire, and a lot of these fires in the situation here. My point is if the fire started accidentally from lightning, he's still going to go and fight it, and he still has a risk, and it's the same risk. If the fire didn't change, it's still the building that's burning. And so the question is if he gets injured while fighting that fire, which is his duty to do, who pays for that? And he has workers' comp that pays for that. But in a situation like that where we have an act of God, there is not a culpable party who puts something in the stream of... There's no change in risk. That's the question. No, there's no change in risk, but there's a difference in who is responsible for compensating the injured firefighter. If there's no change in risk, then there's a question of whether there's any causation caused by a person who does it deliberately as opposed to a person who does it wantonly, or a person who does it negligently, or a person who does it accidentally. In other words, there's no causation from that because the risk is the same. The risk of the fireman is the same. He comes to a fire. It's the same fire. It's still burning the house. And the beam could fall on him while he's fighting the fire, regardless of how it started. Right, but I think there's a distinction between risk and causation here. There's always a risk of being injured in the fire, but the fire's cause from lightning is very different. If you start a fire accidentally, and you get a fire, and then you start a fire intentionally, and you get the same fire, and the firefighter's going to go to either one no matter what, then the way it was started didn't even contribute to his injury. I guess I'd have to respectfully disagree because it's different. The conduct is different. The accidental fire, the negligent fire, is different than one where you've got a defective product out there known to be defected, unremitied, without any warnings, that then sets everything in motion. And I believe that's why there are exceptions to it as opposed to a blanket application. I think your best answer would be the legislature said do it, so we do. It doesn't have to have a reason. Well, in which case, we have the exceptions here, and we believe that the evidence in this case establishes that the exception is met, whether you look under willful or wanton or gross negligence. And if I may, in my last few minutes here, put the critical, admitted, undisputed facts out here. And these come from Norcold. The first one is the defect is a fatigue failure of the corrosion in the boiler tube of the refrigerator, which leaks highly flammable and toxic hydrogen gas. That is the danger. Two, it has caused fires, many, many fires. Three, Norcold has done nothing to remedy the corrosion and the leaking of the gas, showing no care, no care in that situation. Four, it never warned of the risk, even in retrofitted products. The risk of corrosion and leaking still remained. Five, Norcold knew the recall, including the one in this case, wasn't effective at the time it put the recall out there, meaning there was highly flammable leaking gas out of corroding boiler tubes with multiple ignition sources. Six, the HTS, the retrofit, was never intended to address corrosion, leaking of highly flammable gas, or to eliminate all ignition sources. Explain to me how you would put the fireman in this situation in terms of foreseeability. How do you explain, or do you believe it has to be that the fireman providing a fire caused by the product is foreseeable to the manufacturer? Oh, I think it absolutely is, particularly the history of this particular product. There have been many, many fires. But Norcold has never warned. They never required the fireman to put them out? Yes, sir, because these are refrigerators intended to be in RVs. The corrosion happens slowly. You can't see it. You can't detect it. Then you have hydrogen gas, which is invisible, and there's no smell. You can't detect it. But it can even auto-ignite in low concentrations. And then they are meant to be in RVs, which are small, enclosed spaces with a lot of flammable products around them. And there have been hundreds, if not thousands, of these fires. And so it is absolutely foreseeable that first responders would respond to fires like this. An RV goes up very quickly, as in this case and many other cases that we've handled. So not only should the first responders be warned, but of course the owners need to be warned that this defect remains even after there's a recall, that these tubes are continuing to corrode and will eventually leak this hydrogen gas so that they could perhaps take those refrigerators in to have them inspected periodically. What exploded in this fire? That gave shrapnel to the propane tank or something? I'm not sure that that was ever. It had to do, actually, some kind of jack that raised or lowered something on the RV. Hydraulic? Something like that. Hydraulic, I can't remember what it was called. I don't know if it had to do with raising the awnings on the side. And that exploded during the course of the fire? Yes, sir. A piece of shrapnel did it? Yes, sir. So the cause of this injury is an exploding shrapnel. Caused by the fire from the defective product. Was the item that exploded, was it defective? Not that I'm aware of. If it were defective, would there be a cause of action against the manufacturer of the hydraulic lift? I believe so, yes. If it was defective and it was something that could have been prevented, absolutely. Your Honors, we submit... I think you have a red light. I do. Oh, I'm sorry. You're exactly right. It's counting up now. Thank you. Mr. Kahn. May it please the Court, Your Honors. Martin Kahn from Norcold, Bedford and DKMI2. We'll refer to Norcold for simplicity. This appeal today is about the Virginia Fireman's Rule. Both its application in this case and one of the exceptions that the appellants argue should apply. As I will discuss, the Fireman's Rule applies to all of the appellant's claims. And the one exception at issue, willful and wanton conduct against Norcold is not supported by any inference that can be drawn from the facts. And therefore, Your Honors, the District Court properly granted our motion for summary judgment. This is a decision that you should affirm. There have been some questions this morning about the rationale behind the Fireman's Rule. And that was the first thing I wanted to address. Well, my question, and maybe Judge Traxler's, I'm not sure, but my question goes that despite the Fireman's Rule, when the plaintiff goes to prove his case to the jury, doesn't he have to show that the manufacturer's conduct was the proximate cause of his injury? The Fireman's Rule just isolates him from suit. But there's still a causation issue. And remember the old Palsgraf case from law school. You know, the ripples go out forever. You have a butterfly flapping in Beijing, cause a tornado in Houston. This is the type of problem. And the question is, if a manufacturer creates a defective refrigerator, is an injury caused by a piece of shrapnel exploding during the course of a fire, a fireman attends because of his duty as a fireman, is that foreseeable and caused by the defective refrigerator? And it seems to me that may be a causation issue that's quite apart from, that still has to be satisfied independently of this rule. But I think Judge Traxler's right. We're faced in this case only with the Fireman's Rule. That's right. And that is a separate proximate cause issue. When we look at the Fireman's Rule, the only party that can avail itself of the Fireman's Rule is the party that instigated the reason for the fireman to come to the scene. In this case, the allegation is that it was a defective refrigerator that caught on fire. And that was what triggered the events that caused Deputy Colbert to come to the scene. If there was a falling beam that was somehow related to a defect, a separate defect in that RV, I don't think the Fireman's Rule would apply. That's not what started the fire, and that's not what caused Deputy Colbert to come to the scene. Let me complicate it a little further. Sure. Because we've got it all, talking about these things. One of the things, another aspect of this situation that's interesting to me is we're discussing the Fireman's Rule, which I think we would all agree predicated originally on the question of assumption of risk. But in this situation, we have plaintiffs attempting to bring a claim for breach of implied warranty, but assumption of the risk is not a defense to breach of implied warranty. So I don't understand, again, how we try to fit this Fireman's Rule into a situation where the theory of liability or lack of liability was originally predicated on assumption of risk. How do we put that into a situation where assumption of risk is not even a defense for the claimant's fault? So any way you can help me understand this, I would appreciate it. Let me try to help you. Okay. So going back to Virginia's original adoption of the Fireman's Rule in 1968, the Chesapeake and Ohio Railroad be crouched. First, they indicate that the Fireman's Rule is based on the assumption of the risk. But it is not assumption of the risk. If it was just assumption of the risk, a separate rule for firemen and police officers and other first responders wouldn't have been necessary. Instead, the decision in Crouch could have been made on assumption of the risk alone. The language in Crouch and other cases that the Supreme Court has decided, I believe also including Green, distinguished the Fireman's Rule from simple assumption of the risk by indicating that there's a distinct and separate risk that goes along with the duty of taking on the job as a fireman or as a police officer. It's not just the venturesomeness, I believe the court says, associated with going on a joyride in your car. In an automobile case, I think it's what they referenced, that you're assuming the risk when you try to careen down the road at 100 miles per hour. You know what the risk was. You took that risk. But what is separate here, and it's a policy issue that the Supreme Court addressed, that the legislature has adopted, is that this assumption of the risk is made when the officer decides, I'm going to join the police force. I'm going to join the fire department. I'm going to accept the pay, and I believe some of the cases even say fringe benefits, associated with this job that presumably pay better because I'm taking these risks. And then there's the issue of, as your honors have mentioned, that there is workers' comp available for just these risks associated with coming to the scene. So when these officers take their job and they decide, I'm going to assume the risk every time I'm called to a traffic stop or every time I'm called to a fire, they've assumed a risk that is a duty that they have to the public that's separate and apart from a simple assumption of the risk. And those cases are cited starting with the Crouch case, and when we look to other states to see whether it should be expanded to product liability cases that involve strict liability claims, which Virginia doesn't recognize under 402A, they apply that same rationale. So looking at, and I think there's an excellent analysis in White v. Edmonds, an 11th Circuit case that we cited, a case where a Volvo car caught fire, just like in this case, caught a garage on fire, caught a house on fire, and there was an explosion and the fireman was struck by shrapnel. And that court found that in a strict liability case, there would be assumption of the risk, and Virginia's version of assumption of the risk should likewise apply to the fireman's rule. I would like to move on, Your Honor. What do you think if we sent this to the Supreme Court? I think the Supreme Court, do I think we should, or what do I think the Supreme Court should do? What do you think about our doing that? I know you're constrained to try to predict what the Supreme Court would do, and I think the Supreme Court, I don't think that would be a terrible outcome for this, although I do think that there's enough jurisprudence here and enough discussion of the rationale by the Supreme Court to address the question that Judge Traxler asked, that in this situation, a product liability case would be covered just like a negligence case. And it's because the rationale, I believe we've cited to a case, Judge, called Pearson v. Canada Contracting, a 1986 case, the first case that was expanded to police officers, and without deference to the type of the basis for the claim, the finding was the assumption of the risk in these cases of the usual hazards involved by firefighters is regardless of the origin of the fire. It doesn't matter, as your honors have pointed out, the risk that the fireman signs on to, whether it's arson, whether it's a lightning strike. I think that makes exactly good sense. The rules says if it's willful and wanton conduct, they're not going to apply it. And I can't make sense of that because the risk doesn't change whether it's intentional or willful or wanton. The fireman goes to the fire, it's the same type of fire, and he knows when he's going in, that's the risk, that's his duty to face that risk. And putting out the fire. And putting out fires is firemen get smoke inhalation, they get this, they get that, and injuries, and sometimes even lose their lives, but they're losing their lives from doing their duty to fight the fire, which the nature of which doesn't change based on how it started. So I have problems with the rule in the very first place, the whole underlying philosophy of it. The rule as written itself comes a little bit along that line, the assumption of risk of fire, especially a volunteer fireman says, I'm here to fight fires, I enjoy fighting fires. Goes there and he gets hurt. That's on his account. I think the simple answer, as Judge Traxler said, that's what the legislature said. It's even more problematical, even though gross negligence is not part of the statute that's applicable here, they added that last year or whatever it was. In July. Yeah. Which seems to indicate that the legislature is heading in the other direction, that there's some kind of liability flowing from manufacturers through fires to firemen. That's a strange proposition. My question would be is how the Virginia Supreme Court might handle this. Not the gross negligence part, I don't have a lot of trouble with that, but I do have a problem with the theoretical risk. It's probably not an assumption of risk in the common law, because all they were fighting was torts, and since that has grown up in breach of warranty, it's the combined contract tort aspect and the tort aspect, while they're still philosophically incorporating the assumption of risk with the contract part. It doesn't, the contract part is what you need to do in the foreseeability of the terms of the contract. But it doesn't fit well, so your argument is pretty persuasive to say that if it was just assumption of risk, that was pre-existing and they didn't do the rule. Right. So they put the rule in, and they talk about conduct and liability, but I'm not sure this is all very clear. This is a straightforward Virginia state suit, and here are the four circuits coming trying to figure out what the legislature meant by this. There are two other issues that we raised on summary judgment, one of which Judge O'Grady took up as a basis for his finding on the implied warranty that doesn't even cause you to reach the fireman's rule. The first is the application of the anti-privity statute, Virginia Code Section 8.2318. Privity, of course, is no longer required to establish an implied warranty claim. However, there are limitations, and these are contractual. It's not the Paul's graph situation. We're thinking of anything that might foreseeably flow from an action, but instead it's limited to one who is a consumer, one who is a user of the product, or one who is affected by the product. The cases that we've cited, judges, your honors, indicates that that language has been interpreted to include foreseeable users, and Deputy Colbert doesn't fall into that category. He had no, as we've indicated in our briefing, transactional linkage to the product. He wasn't coming over to Mr. Ronald's to have a Dr. Pepper out of his refrigerator. He was coming to fight a fire. When this product was being used, the owner was using it in his RV that day, and Deputy Colbert was off doing his job, maybe writing tickets out on I-95. A fire started. The warrantable issue started, and Deputy Colbert wasn't aware of it. He didn't know Mr. Ronald's. He didn't know Mr. Ronald's owner, RV, or an Oracle refrigerator. He was off doing his job, many miles away. It took him 15 minutes to respond to this, and there's no case law we've been able to find in Virginia, or anywhere under the UCC that would extend 318 to a user who was that far away and that far removed from the product. So I don't think the Supreme Court needs to address the applicability of the fireman's rule to an implied warranty claim where an implied warranty didn't even extend to Deputy Colbert, and Your Honors can agree and affirm the decision of Judge O'Grady on those grounds. We did find cases where it wasn't a user and it wasn't an owner. For example, where there was a steering defect in an automobile, and that automobile was sharing the road with a young girl riding a bicycle right next to the vehicle, and it caused a steering, because they were sharing the road, and because the defect involved the ability to stay and maintain control on the road, that the individual on the bicycle was deemed to have been affected by the warranty of that product that she was sharing the road with. But that's very distinguishable from the case here where Deputy Colbert had nothing to do with this refrigerator, wasn't responding to a refrigerator issue, was responding to a fire, a house fire, a garage fire. And the other issue that was clear cut in this case and that Judge O'Grady didn't address, but is still before Your Honors, and Your Honors are free to decide on these grounds, is that there is a clear and conspicuous disclaimer of the implied warranty of merchantability for this 10-year-old refrigerator that ran to the owner of the refrigerator, and of course Deputy Colbert's warranty rights can rise no higher than the rights of the original owner. And if he had no implied warranty of merchantability for this old refrigerator, then nor did Deputy Colbert. So on both of those grounds, Your Honor. How do you get rid of the negligence claim, or the claim based on willful law and conduct? Well, the way we get rid of it on willful law and conduct is that our client showed, we believe, quite a bit more than this. But all we need to show under willful law and conduct is that there was some care. There is an issue with these refrigerators that high temperatures get created in the boiler tubes. That's what leads to leaking, the temperatures get higher, and eventually there can be a rupture, and these flammable gases can then leak out. If the flammable gases leak out while the boiler tube is overheating to the point where it's reached the ignition temperature of hydrogen gas, then a small fire can start behind these refrigerators. So what Norco did for 10 years, spending $30 million and investigating many, many fires, it put together a review team. It sent fire investigators out to every claim. It cared that these fires were going on. It wanted to find out how do we stop fires. That's the hazard. That's the proximate cause of Deputy Colbert's injury. Leaking gas was not the proximate cause of the injuries in this case. To the extent leaking gas is a defect, it's a defect that reduces the performance of the refrigerators. It's one that if you have a refrigerator that's still under warranty and it's leaking gas,  but the issue, the safety issue that might have made a refrigerator unreasonably dangerous. Yeah, where somebody in the kitchen, a guest in the kitchen, helping the owner cook eggs gets burned by the explosion. It's public property. Under every warranty, every concept of negligence and causation. Well, except for the application. Yes, I mean, they weren't responding to the fire. They were just present. Yeah. Agreed. The owner of the refrigerator invites a guest over and they're cooking eggs. And this refrigerator explodes and burns both of them. They both have claims. Agreed. And in this case, in fact, there were claims originally by the owner. He wanted to be reimbursed for his property damage. And that ultimately resolved. We didn't deal with that issue. But the issue here is, was there a showing of some care to overcome willful wanton conduct? And the fact that there was leaking gas is dealt with by Norcold's efforts and the recalls to put a monitor on the back of these boiler tubes that would shut the unit down, prevent it from heating up any further, if well before the ignition temperature of hydrogen gas would take effect. And it worked. What we found was that the number of claims dropped dramatically. That's in the record. Year after year, when this HTS was put into effect in 2010, every year claims went down. Every year claims went down. But even then, Norcold continued to keep its incident log updated, continued to send fire investigators out to investigate claims. A lot of these are just claims. Anytime an RV burns, Norcold will get a claim. Sometimes it wasn't even a Norcold refrigerator but one of its competitors. But when it investigated the claims, what it found was if there was a Norcold refrigerator, almost in every instance the HTS safety guard had been either improperly installed or it had been tampered with or bypassed. Because if somebody's sodas aren't staying cold, they could go back and jimmy rig the HTS, rendering it inoperative, and that's how they could get it to shut back on and keep cooling. Over this five-year period between the time of the recall and the time of the accident, Norcold's maybe identified a handful. I think there were six cases where it appeared from their investigation that the HTS was still properly installed and hadn't been bypassed but still there was a fire that they couldn't explain. Addressing that, they did a number of things. First, they saw there were false positives that might cause refrigerators to shut down, irritating customers and causing them to bypass the refrigerators. They modified the HTS to limit this problem. They had issues with installation, so they changed the installation instructions. They made them in color. They made them more simple. They kept constantly trying to reduce the risk of fire, down to where they've reduced it almost to a negligible amount, and it was almost negligible by 2015 when this accident occurred. So, Your Honors, on the one exception that they claim willful wanton conduct, the standard to prove that level and even demonstrate some evidence is so high that they haven't even approached it. The efforts here to end the risk of fires is the risk that Your Honors need to consider and that Norcold considered, spent millions on, spent man hours on, involved its engineers in investigating, and has continuously, up to the time of the accident, worked in every which way to show that they cared. It's an issue, Judge, of not adequacy of their actions but whether they showed any care. And they've come well beyond the level of any care with the extensive efforts they've made, very publicly, not to conceal the defect to save money, but instead to spend money and put it out in front of the public and the National Highway Traffic Safety Administration and say, we have a problem, we're dealing with it, here's how we're dealing with it, make sure you keep your safety guard on. Thank you for your time. Marks. Thank you, Your Honors. I think it's important here to understand that sometimes the legislature has a reason for doing things. And in this situation, the legislature, even if it seems a bit inconsistent, decided to carve out circumstances under which a first responder could sue for injuries. And in this case, that would be under where there exists willful and wanton conduct. We contend that the gross negligence would apply, but even if it doesn't, we contend that there was at least a genuine issue of material fact as to willful and wanton conduct on the part of Norfolk, in the sense that it did not address the underlying defect. The corrosion, which caused the leaking of highly flammable gases. You're just saying they didn't eliminate it. They did not. There is more than one ignition source for hydrogen. It has thousands of ignition sources. It can even auto-ignite. So the idea that they eliminated the potential of one ignition source and overheated boiler tube, which was not effective in 100% of the cases. Norcold admitted that fires continued with properly installed and non-bypassed HTSs. Their corporate representatives testified under oath that that still occurred. What they also testified under oath was when they redesigned the unit in 2012 to include thicker boiler tubes, then the fire stopped. That was considered a solution by Norcold's own engineer in 2005 that they never implemented until the 2012 redesign. They knew the HTS was ineffective to stop the fires. Are you arguing that what I said was wrong, which it could have been, or are you arguing that they did not address it? They did not address the defect, which is there's leaking highly flammable hydrogen gas that can be ignited by more than just a... I'm sorry. Your counterpart recited the whole history of how they addressed it. They addressed it with this device or that device. They put it in this guide. They issued some notices of what to do. These are all things that may not have been effective fully. But they were in the process of addressing it. They kept an open wall that was obtained. So that doesn't sound like a wanton conduct. It sounds more like they addressed it and questioned whether they did or not. But that's another issue altogether. The thicker boiler tubes came in the 2012 redesign. That's not the refrigerator that was here, although that was a solution given to Norcold. It was part of this whole effort from the beginning. You have 16 ways to solve a problem, and you start with this one and you go with this one. Let's put a bypass on. Let's put a shutdown, automatic shutdown. But in this case, for this refrigerator, only the HTS was offered, and it was known to be ineffective. And then there was no warnings given to alert owners that you can still have this happen, so you better take it in, you better have it checked periodically. There was no care given to warn that this defect still existed and could still manifest later, even after the HTS was installed, because there weren't thicker boiler tubes on this refrigerator. So there was no effective remedy for this refrigerator. Is that the criterion? I thought the criterion is whether they took some care to address it. To address the danger. And the danger here was leaking highly flammable gas that could be ignited by multiple sources, not just one. And that's the issue here. And where that danger was not addressed, particularly in the form of a warning, that is critical here. The danger still existed for the Runnels. They had the HTS on. The HTS had not been bypassed, and it had been properly installed. There's no evidence to the contrary. And yet this fire still occurred. This is one of those cases where that happened. And had there been a warning, that could have prevented that, because Mr. Runnels was a very conscientious former fireman himself and was very careful about his maintenance, the maintenance of his vehicles. So as to the warranty, I want to address that really, really quickly. Colbert was affected by this product. It's not only whether he was a foreseeable user. The affected by is separated from that. In addition, there's no evidence this was effectively disclaimed as to the Runnels, because the requirements in the statute were not met, which require a showing in the sale of contract that the statutorily required language was there. There was no evidence entered by defendant as to the sale of the contract and what was there. Also, they did not seek summary judgment on warranty with regard to Mr. Colbert. And I see my time's expired. Okay, thank you. Thank you. We'll adjourn the court until tomorrow morning and then come back and recount. The honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, William B. Traxler, Jr., Stephanie D. Thacker